# 20-2748-cv

## In the
## United States Court of Appeals
## For the Second Circuit

DDK HOTELS, LLC, DDK/WE HOTELS MANAGEMENT, LLC,

*Plaintiffs-Appellees,*

DDK/WE HOSPITALITY PARTNERS, LLC,

*Plaintiff-Counter-Defendant-Appellee,*

– v. –

WILLIAMS-SONOMA, INC. and
WILLIAMS-SONOMA STORES, INC.,

*Defendants-Counter-Claimants-Appellants.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-COUNTERCLAIM-
## DEFENDANTS-APPELLEES

Thomas S. Fitzpatrick
DAVIS, MALM & D'AGOSTINE, P.C.
One Boston Place
Boston, Massachusetts 02108
(617) 589-3865

*Attorneys for Plaintiffs-Counterclaim-
Defendants-Appellees*

# TABLE OF CONTENTS

INTRODUCTION ...................................................................................1

STATEMENT OF CASE ........................................................................3

SUMMARY OF ARGUMENT ...............................................................6

ARGUMENT .........................................................................................10

1. Inquiry into the question of whether the parties have delegated
   arbitrability requires the Court to examine and interpret the entirety
   of both the arbitration provision and the agreement...........................10

   A. The Court cannot assume that the parties agreed to
      arbitrate arbitrability absent "clear and unmistakable" evidence
      that they did so. ...........................................................................10

   B. *Bucsek* requires an examination of the parties' agreement
      to determine if the parties clearly and unmistakably agreed to
      arbitrate arbitrability. .................................................................12

   C. West Elm would have this Court ignore, and abandon,
      its own precedent..........................................................................14

   D. West Elm's attempts to distinguish *Bucsek* are unavailing.........15

2. Incorporation of the AAA Rules alone is not clear and unmistakable
   evidence of an intent to delegate arbitrability. .................................16

   A. Incorporating the AAA Rules does not per se demonstrate the
      required clear and unmistakable evidence of intent to delegate
      arbitrability of all disputes. .........................................................16

   B. West Elm advocates for an automatic implied delegation theory
      that is contrary to applicable law. ...............................................19

3. The district court did not err in its analysis of the Deadlock Section
   of the JV Agreement.........................................................................24

i

A.  The district court properly analyzed Section 16(b) of the Deadlock Section under *Bucsek*. .................................................................25

B.  The district court did not err in ruling that a dispute under Section 21(h) did not fall within Section 16(b) of the Deadlock Section..............29

C.  Incorporation of the AAA Rules into Section 16(b) of the JV Agreement did not strip the district court of its authority to rule on arbitrability. ...............................................................................31

4.  West Elm's semantic game about "carve-outs" does not alter the persuasive authority of S*chein II* and the controlling precedent of *NASDAQ OMX*. ....................................................................33

A.  *Schein II* supports affirmance of the district court's Order........................33

B.  *NASDAQ OMX* is controlling and mandates affirmance because it instructs that the AAA Rules "apply [only] to such arbitrations as may arise under the Agreement." ...............................................36

5.  DDK Hospitality's request for "prevailing party" fees under Section 21(h) of the JV Agreement. ..................................................39

CONCLUSION ........................................................................39

# TABLE OF AUTHORITIES

## Cases

*Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.*,
  1999 WL 743479 (Del. Ch. Sept. 10, 1999)..........................................................27

*Archer and White Sales, Inc. v. Henry Schein*,
  935 F.3d 274 (5th Cir. 2019) .............................................................. 9, 33, 34, 35

*AT&T Techs., Inc. v. Comms. Workers of America*,
  475 U.S. 643, 649, 106 S. Ct. 1415, 1418 (1986) ...............................................24

*C & L Enters., Inc. v. Citizen Band Patawatomi Indian Tribe of Okla.*,
  532 U.S. 411, 121 S. Ct. 1589 (2001) ..................................................................22

*Contec Corp. v. Remote Solution Co.*,
  398 F.3d 205 (2d Cir. 2005) .......................................................... 18, 19, 29, 32

*Cornell Univ. v. UAW Local 2300*,
  942 F.2d 138 (2d Cir. 1991) ...............................................................................27

*First Options of Chicago, Inc. v. Kaplan*,
  514 U.S. 938, 115 S. Ct. 1920 (1995) ....................................................... *passim*

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  139 S. Ct. 524 (2019).................................................................................. *passim*

*Henry Schein, Inc. v. Archer & White Sales, Inc.*,
  No. 19-963, 114 S. Ct. 107, 2020 WL 529125 (U.S. Jan. 31, 2020) ..................36

*Henry Schein, Inc. v. Archer and White Sales, Inc.*,
  No. 19-963, 141 S. Ct. 656, 2021 WL 231537 (U.S. Jan. 25, 2021) ..................36

*Howsam v. Dean Witter Reynolds, Inc.*,
  537 U.S. 79, 123 S. Ct. 588 (2002) .......................................................... 10, 11, 24, 25

*iBio, Inc. v. Fraunhofer USA, Inc.*,
  2016 WL 4059257 (Del. Ch. July 29, 2016) .......................................................27

iii

*Karsner v. Lothian*,
  532 F.3d 876 (D.C. Cir. 2008)...............................................................15

*Katz v. Feinberg*,
  290 F.3d 95 (2d Cir. 2002) ...................................................................32

*Mastrobuono v. Shearson Lehman Hutton*,
  514 U.S. 52, 115 S. Ct. 1212 (1995) ...................................................20

*Metropolitan Life Ins. Co. v. Bucsek*,
  919 F.3d 184 (2d Cir. 2019), *cert. denied,* 140 S. Ct. 256 (2019) .............. *passim*

*Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth*,
  473 U.S. 614, 105 S. Ct. 3346 (1986) ................................................11

*NASDAQ OMX Group, Inc. v. UBS Securities, LLC*,
  770 F.3d 1010 (2d Cir. 2014) ....................................................... *passim*

*National Credit Union Admin. Bd. v. U.S. Bank National Ass'n*,
  898 F.3d 243 (2d Cir. 2018) ...............................................................27

*Oracle America, Inc. v. Myriad Group, A.G.*,
  724 F.3d 1069 (9th Cir. 2013) ...................................................... 22, 36

*Painewebber, Inc. v. Bybyk*,
  81 F.3d 1193 (2d Cir. 1996) ......................................................... 23, 24

*Rent-a-Center, West, Inc. v. Jackson*,
  561 U.S. 63, 130 S. Ct. 2772 (2010) ...................................................18

*Sacks v. SEC*,
  648 F.3d 945 (9th Cir. 2011) ..............................................................15

*Saizhang Guan v. Uber Tech., Inc.*,
  236 F. Supp.3d 711 (E.D.N.Y. 2017).............................................. 37, 38

*Seidensticker v. Gasparilla Inn, Inc.*,
  2007 WL 4054473 (Del. Ch. Nov. 8, 2007).......................................27

iv

*Shaw Group, Inc. v. Triplefine Int'l Corp.*,
 322 F.3d 115 (2d Cir. 2003) .................................................................23

*Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*,
 559 U.S. 662, 130 S. Ct. 1758 (2010) ................................................20

*UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*,
 660 F.3d 643 (2d Cir. 2011) .................................................................15

*VKK Corp. v. National Football League*,
 244 F.3d 114 (2d Cir. 2001) .................................................................27

*Wells Fargo Advisors, LLC v. Sappington*,
 884 F.3d 392 (2d Cir. 2018) .................................................................25

*Worthington v. JetSmarter, Inc.*, 1
 8-civ-12113 (KPF), 2019 WL 4933635 (S.D.N.Y. Oct. 7, 2019)............. 4, 5, 18

Zachariou v. Manios,
 68 A.D. 3d 539, 891 N.Y.S.2d 54, (1st Dep't 2009)...........................................18

## Statutes

Securities Exchange Act of 1934, 15 U.S.C. § 78o-3.............................................15

## Rules

AAA Comm. Rule 7(a) ................................................................ *passim*

**INTRODUCTION**

This controversy between Defendant/Appellant Williams-Sonoma Stores, Inc. ("West Elm") and Plaintiff/Appellee DDK/WE Hospitality Partners, LLC ("DDK Hospitality") arises under the Limited Liability Company Agreement ("JV Agreement") between the parties, which is the operating agreement of West Elm Hotels, LLC (the "Company").

DDK Hospitality and West Elm each own 50% of the Company and are its only two members. Sealed Appendix ("SA"), 2, 25; *Appellants' Brief* ("*App. Br.*"), p. 7. Although the Company is member-managed, the members must act through a six-person Board, to which DDK Hospitality and West Elm each appoints three directors. SA 4. Each group of Board appointees possess 50% voting rights and votes as a block. SA 6, 25. Where Board approval is required under the JV Agreement, both groups of Board appointees must vote in the affirmative. SA 6.

This presented the possibility of the Board deadlocking on business decisions. So, the parties agreed to a procedure to address such deadlocks. SA 15-16. Section 16 of the Agreement sets forth a Board deadlock resolution device entitled "Deadlock" (the "Deadlock Section"). It is very narrow in scope. Though it contemplates the possibility of arbitration, it is not an "all claims" or "all disputes" arbitration provision. The Deadlock Section is a corporate governance mechanism that applies only to "Disputed Matter[s]," a defined term, meaning where the

1

"Members (acting through the Board) are unable to agree on a matter requiring Board or Member approval (a 'Deadlock')," subject to a list of exceptions. SA 15-16.

West Elm's appeal posits that – but never explains how – DDK Hospitality's breach of contract claim for West Elm's refusal to pay DDK Hospitality its prevailing party fees under Section 21(h) of the JV Agreement is an arbitrable claim under the Deadlock Section. It insists, moreover, that whether the claim is arbitrable – it is not – must be resolved by an arbitrator and not a court. *App. Br.,* pp. 15-16, 24-25.

West Elm's arguments find no footing in either the text of the Deadlock Section, including the definition of "Disputed Matters," which are the only controversies the parties agreed to arbitrate, or the decisions of this Court.

Whatever else may be said about the district court's decision below, it scrupulously followed this Court's holdings in *Metropolitan Life Ins. Co. v. Bucsek*, 919 F.3d 184 (2d Cir. 2019), *cert. denied,* 140 S. Ct. 256 (2019), and *NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010 (2d Cir. 2014). Indeed, West Elm makes no argument that the district court did not adhere to those precedents.

## STATEMENT OF CASE

On February 11, 2019, DDK Hospitality filed a Rule 12(b)(6) motion to dismiss West Elm's complaint in the Delaware Dissolution Action. West Elm opposed the motion to dismiss. Joint Appendix ("JA") 45.

On June 27, 2019, Vice Chancellor J. Travis Laster of the Delaware Chancery Court rendered his ruling on DDK Hospitality's Motion To Dismiss and ruled that West Elm's Delaware Dissolution Action be dismissed without prejudice. JA 46. He concluded, *inter alia*, that West Elm had failed to plead facts that stated a claim for dissolution. *Id.*

On July 31, 2019 and August 8, 2019, counsel for DDK Hospitality sent demands, pursuant to Section 21(h) of the JV Agreement, that West Elm pay DDK Hospitality $67,594.31 for its reasonable costs, charges and expenses incurred as the prevailing party in the Delaware Dissolution Action. JA 47.

On August 15, 2019, West Elm's counsel sent DDK Hospitality's counsel a letter asserting that DDK Hospitality "is not entitled to payment of its costs, charges and expenses" in West Elm's unsuccessful Delaware Dissolution Action. *Id.*

On September 3, 2019, DDK Hospitality filed its Motion for Leave To File A First Supplemental Complaint in this action in the Eastern District of New York for the purpose of adding DDK Hospitality's claim for West Elm's breach of Section 21(h) of the JV Agreement. JA 14.

3

On September 20, 2019, West Elm opposed the motion, arguing that DDK Hospitality's motion was futile. JA 73. West Elm's principal argument was that the dispute over whether the prevailing party provision of Section 21(h) falls within the JV Agreement's Deadlock Section 16, should *not* be decided by the district court but rather, had to be determined by an arbitrator. JA 77, 83.

However, Section 16 does not apply to all claims or all disputes between the parties. It functions solely to resolve "Deadlock[s]" of the Board of the Company and applies solely to "Disputed Matter[s]." SA 16. Neither the Board nor the Members of the Company, acting through the Board, ever deadlocked on the issue of DDK Hospitality's legal fees or its claim under Section 21(h). It was not a matter for the Company or its Board or requiring the Board's approval. The Company did not incur the fees and has no obligation to pay them. DDK Hospitality's claim for breach of Section 21(h) was never subject to Deadlock Section 16.

The district court would ultimately reject West Elm's arguments and allow the motion to file the First Supplemental Complaint. JA 193. Before it did, however, West Elm sought to reinforce its argument by invoking the Supreme Court's decision in *Henry Schein, Inc. v. Archer & White Sales, Inc.*, 139 S. Ct. 524 (2019) ("*Schein I*") and the decision of the Southern District of New York in *Worthington v. JetSmarter, Inc.*, 18-civ-12113 (KPF), 2019 WL 4933635 (S.D.N.Y. Oct. 7, 2019). To that end, on October 30, 2019, West Elm filed its Notice of Supplemental

4

Authority, which was a five page legal memorandum, the organizing principle of which was West Elm's argument that under *Schein I* and *Worthington* the issue of arbitrability of DDK Hospitality's breach of contract claim is delegated to the arbitrator. JA 128-132.

On November 15, 2019, DDK Hospitality filed a Notice of Controlling Authority, which provided the district court with a copy of this Court's opinion in *Metropolitan Life Ins. Co. v. Bucsek*, 919 F.3d 184 (2d Cir. 2019), *cert. denied,* 140 S. Ct. 256 (2019). JA 146-158. The *Bucsek* decision is this Court's instruction manual on how district courts in the circuit are to apply *Schein I.*

On March 12, 2020, Magistrate Judge Cheryl Pollak issued her Memorandum And Order granting DDK Hospitality's motion to file the First Supplemental Complaint. In it, she ruled, in relevant part:

> Having reviewed the respective provisions of the JV Agreement, the Court concludes that Section 21(h) of the JV Agreement is the operative provision governing this fee dispute, and that the dispute does not trigger the Section 16 requirement of Board approval.

JA 201. She also rejected West Elm's argument that DDK Hospitality's contention that it was the prevailing party was unsupported and futile. *See* JA 201-206.

On March 27, 2020, West Elm filed its Motion To Dismiss Plaintiff's First Supplemental Complaint And To Compel Arbitration, which was, of course, opposed. JA 261, 404.

5

On July 20, 2020, District Judge I. Leo Glasser issued his Memorandum and Order, denying Defendants' Motion To Dismiss The First Supplemental Complaint And To Compel Arbitration. His decision on that matter concludes as follows:

> Having determined that the JV Agreement does not clearly or unmistakably delegate the issue of arbitrability, the Court finds, as Judge Pollak did, that DDK Hospitality's supplemental claim is not subject to Section 16's dispute resolution procedures. [Footnote: *Henry Schein* does not require a different result. West Elm errs in reading *Henry Schein* to preclude this Court from examining whether there is clear and unmistakable evidence of an agreement to delegate arbitrability. *Henry Schein* only considered the lower court's application of the wholly groundless exception, but ultimately remanded for a finding as to whether there was clear and unmistakable evidence of an intent to delegate arbitrability. 139 S. Ct. at 531.] In seeking to compel arbitration, West Elm relies on the same argument that Judge Pollak previously rejected, namely, that a demand for fees under Section 21(h) is subject to approval by the JV's board. The Court cannot endorse that strained reading of Section 21(h), which imposes no obligation on the JV and requires no action by its board. Therefore, the motion to dismiss and compel arbitration is denied.

Special Appendix ("SPA"), 23-24.

West Elm elected to take an interlocutory appeal of that Order.

## SUMMARY OF ARGUMENT

The district court did not err in concluding that the "JV Agreement explicitly limits the scope of arbitrable issues to 'Disputed Matters'" and thus the "the JV

Agreement does not clearly or unmistakably delegate the issue of arbitrability . . . ." SPA 23. Consequently, the district court did not err in reaching its own conclusion that "DDK Hospitality's supplemental claim is not subject to Section 16's dispute resolution procedures." *Id.*

It has long been true that absent clear and unmistakable evidence of intent to delegate the question of arbitrability to the arbitrator, such gateway issues are for the courts to decide. *First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944, 115 S. Ct. 1920, 1924 (1995). West Elm, as the party arguing for delegation of the arbitrability question, bears the burden of proof on this issue. It points solely to Section 16(b) of the Deadlock Section of the JV Agreement as support. Section 16(b) requires submission of those "Disputed Matters" not resolved by the mediation provisions set forth in Section 16(a) to arbitration, the procedures of which are governed by the AAA Commercial Rules ("AAA Rules"). Because Rule 7(a) of those Rules grants arbitrators the authority to rule on their own jurisdiction, *i.e.* arbitrability, West Elm argues Section 16(b) demonstrates clear and unmistakable evidence of intent to delegate arbitrability to the arbitrator.

However, Section 16(b) does not submit to arbitration "any" or "all" disputes related to or arising under the JV Agreement. SPA 23. The plain language of that section indicates the parties agreed to submit only a narrow class of "Disputed Matters" to binding arbitration "for resolution in accordance with the [AAA

7

Commercial Rules." SA 16. All other disputes are excepted from arbitration and thus left to the courts for adjudication. Because the AAA Rules govern only those disputes contractually submitted to arbitration, Section 16(b) does not explicitly address who decides arbitrability for those disputes not contractually submitted to arbitration.

Under the law of this Circuit, arbitration agreements containing a so-called "qualifying provision" or "carve-out" do not present the necessary clear and unmistakable intent to delegate arbitrability to an arbitrator. *NASDAQ OMX Group, Inc. v. UBS Securities, LLC*, 770 F.3d 1010, 1031-32 (2d Cir. 2014). If there is any ambiguity as to whether the parties intended to delegate arbitrability, then the court must analyze the parties' agreement and arbitration provision, in its full context, to determine the parties' intent. *Bucsek*, 919 F.3d at 190-91. The district court performed that analysis, as required, noting that while "incorporating AAA rules typically evinces clear and unmistakable intent to delegate questions of arbitrability, such provisions do not exist in a vacuum." SPA 23. Where arbitration provisions limit the scope of arbitrable disputes, it follows that the parties limited their delegation of the arbitrability question only to certain arbitrable disputes. This is not a determination as to scope, nor is it a "wholly groundless" determination. The district court was entitled, indeed, it was required, to make a ruling on the arbitrability question.

8

West Elm throws out a host of arguments to distract from the reality that the district court correctly followed and applied *Bucsek,* as it was required to do. It argues that incorporation of the AAA Rules alone is enough, regardless of what the JV Agreement says to the contrary. *See App. Br.,* pp. 24-26. Neither the Second Circuit nor the U.S. Supreme Court has endorsed this theory of broad automatic implied delegation stemming from incorporation of the AAA Rules. West Elm also argues that because the carve-outs for injunctive relief and "Fundamental Decisions" are not implicated, *NASDAQ OMX* and the Fifth Circuit's 2019 decision on remand in *Archer and White Sales, Inc. v. Henry Schein*, 935 F.3d 274 (5th Cir. 2019) ("*Schein II*") do not apply here. *App. Br.*, pp. 27-37. That argument is incorrect. First, it is the qualifying definition and limitation of "all Disputed Matters," which eliminates numerous potential disputes from arbitration, not the two enumerated carve-outs that West Elm fixates upon in its straw man argument. Second, neither case is confined to its facts and both have far broader holdings than West Elm suggests. If a qualifying provision compels only certain issues to arbitration, there is not clear and unmistakable evidence of intent to delegate arbitrability, and the Court has the authority to analyze the arbitration agreement. *NASDAQ OMX*, 770 F.3d at 1031; *Schein II*, 935 F.3d at 283. For those reasons, *NASDAQ OMX* does control the outcome of this appeal and *Schein II* is persuasive authority in favor of affirmance.

This Court should rule that the district court's interpretation of the Deadlock Section of the JV Agreement was faithful to the controlling precedent of *Bucsek* and *NASDAQ OMX*.

## ARGUMENT

1. **Inquiry into the question of whether the parties have delegated arbitrability requires the Court to examine and interpret the entirety of both the arbitration provision and the agreement.**

   A. **The Court cannot assume that the parties agreed to arbitrate arbitrability absent "clear and unmistakable" evidence that they did so.**

The long-standing rule of the Supreme Court, the U.S. Circuit Courts of Appeals, and this Court, in particular, is that the question of whether parties have submitted a dispute to arbitration, *i.e.*, arbitrability, is an issue for judicial interpretation unless the parties clearly and unmistakably provide otherwise. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 83, 123 S. Ct. 588, 591 (2002); *First Options*, 514 U.S. at 944, 115 S. Ct. at 1924; *Schein I*, 139 S. Ct. at 531; *Bucsek*, 919 F.3d at 190. Indeed, the Supreme Court has instructed that "courts 'should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so.'" *Schein I*, 139 S. Ct. at 531, *quoting First Options*, 514 U.S., at 944, 115 S. Ct. 1924 (alterations omitted in *Schein I*).

10

To the extent there is an "emphatic federal policy in favor of arbitral dispute resolution," *see, e.g. Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth,* 473 U.S. 614, 631, 105 S. Ct. 3346, 3356 (1986), the rule promulgated in *First Options* and its progeny flips that policy on its head – without clear and unmistakable evidence, a court should instead presume that the parties did not intend to arbitrate arbitrability. There is a "strong pro-court presumption as to the parties' likely intent." *Howsam*, 537 U.S. at 86, 123 S. Ct. at 593. The parties' right of access to courts "is of such importance that courts will retain authority over the question of arbitrability of the particular dispute" unless the parties provide clear and unmistakable evidence of an intent to delegate arbitrability to an arbitrator. *Bucsek*, 919 F.3d at 190. Otherwise, ceding to an arbitrator resolution of the arbitrability question would "incur an unacceptable risk that parties might be compelled to surrender their right to court adjudication, without their having consented." *Id., citing First Options,* 541 U.S. at 945, 115 S. Ct. at 1925.

**B.** ***Bucsek* requires an examination of the parties' agreement to determine if the parties clearly and unmistakably agreed to arbitrate arbitrability.**

Parties may agree to delegate gateway questions of arbitrability; they may also agree not to.[1] *Bucsek* requires a court to determine the scope of an arbitration provision to correctly decide whether the parties delegated the arbitrability question or left it for the courts. Where an issue of arbitrability is raised, a court "must examine the parties' agreement to determine whether they clearly and unmistakably agreed to have that issue resolved by arbitrators." *Id.*, 919 F.3d at 191. It necessarily follows that "what the arbitration agreement says about whether a category of dispute is arbitrable can have an important bearing on whether it was the intention of the agreement to confer authority over arbitrability on arbitrators." *Id.*

With these principles in mind, the *Bucsek* Court determined whether the dispute at issue fell within the arbitration provision applicable there. *Id.* at 192-193.

---

[1] West Elm appears to suggest on page 18 of its brief that *Schein I* stands for the proposition that delegation of arbitrability for some issues is the same as delegation of arbitrability for all issues, thereby removing the courts from the equation. That is incorrect. The *Schein I* Court made clear that agreements must be enforced according to their terms and that parties *may* delegate gateway issues to the arbitrator. *Schein I*, 139 S. Ct. at 529. The *Schein I* Court did not say that the presence of a delegation provision, whether by means of AAA Rules or otherwise, means a court cannot analyze the meaning of an arbitration clause or that parties cannot delegate some gateway issues and not others.

12

It concluded that "if the arbitrability of this dispute is to be determined by the court, it is not arbitrable." *Id.* at 193. While that was not determinative of arbitrability, it played a significant role in the Court's ruling that there was not "a clear and unmistakable inference that the contract intended to confer resolution of arbitrability on the arbitrator." *Id.* at 195.

It is important to note that the *Bucsek* rationale is not tantamount to employing the "wholly groundless exception" abrogated in *Schein I*. This Court reconciled its decision with *Schein I*:

> The proposition that there is no valid "wholly groundless exception" to enforcing an arbitration agreement that gives the arbitrators authority over the question of arbitrability does not suggest that, in interpreting the agreement to discern whether it intended to confer the resolution of arbitrability on the arbitrators, the court should not consider all pertinent evidence. We reject Bucsek's claim for arbitration of arbitrability not because we view the claim of arbitrability as groundless. We reject it because, upon consideration of all evidence of the intentions of the arbitration agreement, including the groundlessness of Bucsek's claim of arbitrability, the agreement does not clearly and unambiguously provide for arbitration of the question of arbitrability.

*Bucsek*, 919 F.3d at 196. To evaluate the arbitrability question, a district court can, and must, evaluate the merits of the contention that the arbitration clause applies in the first place. To rule that an arbitration clause does not apply to a particular dispute is not to sweep aside a party's argument as "wholly groundless." Rather, it is to do

13

what this Court, and the Supreme Court, have held must be done – evaluate gateway issues before sending a dispute to the arbitrator.

### C. West Elm would have this Court ignore, and abandon, its own precedent.

West Elm's extreme and untenable position is that the district court erred by considering, and that this Court is not permitted to consider, whether the agreement calls for arbitration of the dispute. *App. Br.*, pp 23-24. It contends that if a reference to the AAA Rules "is present," the Court has no authority to examine the agreement to determine whether the parties clearly and unmistakably agreed to arbitrate arbitrability. *Id*.

Not only does that contention crash headlong into the numerous, consistent instructions in *Bucsek* that such examination is required, it was explicitly rejected in *Bucsek*. Like the unsuccessful party in *Bucsek* seeking arbitration of arbitrability, West Elm "essentially construes *Henry Schein [I]* to mean that a court considering whether the arbitration agreement confers authority over arbitrability on the arbitrators may not consider whether the agreement calls for arbitration of the dispute." *Id*. at 195. This Court rejected that argument in *Bucsek*. *Id*. It should do so again here.

14

### D.    West Elm's attempts to distinguish *Bucsek* are unavailing.

The fact that West Elm has no credible answer to *Bucsek* is confirmed by its choice to acknowledge *Bucsek* only in the final footnote at the very end of its brief. West Elm also attempts to confine *Bucsek* to its facts, asserting incorrectly that the arbitration agreement in that case "dealt with provisions of the industry's self-promulgated NASD code" and not the AAA Rules. *App. Br.*, p. 37, n. 16. In fact, in *Bucsek* the district court "assumed" that the FINRA Code governed, and this Court "focus[ed] on its provisions." *Id.* 919 F.3d at 189.[2]  Of course, for purposes of contract interpretation, it matters not whether the arbitration rules come from the AAA, FINRA or the NASD. Moreover, there is nothing in *Bucsek*, or its broad commands (*e.g.*, "we must examine the parties' agreement," *id.*, at 191), that suggests it is not applicable to agreements that incorporate AAA Rules.

West Elm also argues that AAA Commercial Rule 7(a) is materially different than FINRA Rule 13413 on the issue of the arbitration panel's authority to interpret

---

[2] "Since 2007, FINRA has been a self-regulatory organization established under Section 15A of the Securities Exchange Act of 1934 (the 'Exchange Act'), 15 U.S.C. § 78o-3; *Karsner v. Lothian*, 532 F.3d 876, 879 n. 1 (D.C. Cir. 2008); SEC Release No. 34-56145 (July 26, 2007), and has had the authority to exercise comprehensive oversight over 'all securities firms that do business with the public.' *Sacks v. SEC*, 648 F.3d 945, 948 (9th Cir. 2011) (quoting Fed.Reg. 42170 (Aug. 1, 2007))." *UBS Financial Services, Inc. v. West Virginia University Hospitals, Inc.*, 660 F.3d 643, 648 (2d Cir. 2011).

and determine the applicability of the provisions, including the arbitration provision, of the FINRA Code. Those provisions of the FINRA Code, which are quoted in *Bucsek*, reveal no material difference.

*Bucsek* controls this case, and West Elm has failed to demonstrate otherwise. Whether the FINRA Code, the NASD Code or the AAA Rules applied makes no difference to *Bucsek's* ultimate holding that a court must thoroughly analyze the agreement to discern the intent of the parties on matters of arbitrability. *Bucsek* at 919 F.3d at 195.

**2.     Incorporation of the AAA Rules alone is not clear and unmistakable evidence of an intent to delegate arbitrability.**

**A.     Incorporating the AAA Rules does not per se demonstrate the required clear and unmistakable evidence of intent to delegate arbitrability of all disputes.**

West Elm bears the burden of demonstrating the parties clearly and unmistakably intended to delegate the arbitrability question. *Bucsek*, 919 F.3d at 188 n.2 (employee seeking to compel arbitration bears burden of proof on question of arbitrability of dispute); *NASDAQ OMX*, 770 F.3d at 1032 (party arguing intent to submit arbitrability disputes to arbitration bears burden of demonstrating clear and unmistakable expression of parties' intent to do so). Its chief argument is that solely by incorporating the AAA Rules into the arbitration provision of the JV Agreement's Deadlock Section, the parties provided clear and unmistakable evidence of their

intent to send all questions of arbitrability to the arbitrator. That contention is meritless.

This Court has not held that merely by incorporating AAA Rules, the parties demonstrate their intent for all disputes to go to the arbitrator. In *NASDAQ OMX*, 770 F.3d at 1032, this Court held the exact opposite, stating that in an arbitration clause, even a "broad" one, incorporating AAA Rules alone does not signal clear and unmistakable intent to delegate questions of arbitrability. *Id,* 770 F.3d at 1032.

In that case, the arbitration clause read "*[e]xcept as may be provided in the NASDAQ OMX Requirements*, all claims, disputes . . . shall be settled by final and binding arbitration." *Id.* at 1031 (emphasis in original). Despite the agreement's incorporation of AAA Rules in the arbitration clause, this Court held there was enough ambiguity in the agreement to leave the arbitrability question to the court. *Id.* at 1032. The Court explained:

> In fact, the Services Agreement does not clearly and unmistakably direct that questions of arbitrability be decided by AAA rules; rather, it provides for AAA rules to apply to such arbitrations *as may arise under the Agreement*. As noted, Section 18.A of the Services Agreement carves out certain issues from arbitration, a circumstance that thus delays application of AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitrability is decided. Thus, this case is not akin to those in which we have construed the incorporation of AAA rules into an agreement with a broad arbitration

17

clause to signal the parties' clear and unmistakable intent to submit arbitrability disputes to arbitration. *See, e.g.*, *Contec Corp. v. Remote Solution Co.*, 398 F.3d [205,] at 208 [(2d Cir. 2005)]; *cf. Zachariou v. Manios*, 68 A.D. 3d 539, 539, 891 N.Y.S.2d 54, 55 (1st Dep't 2009) (holding that reference to AAA rules in conjunction with narrow arbitration provision does not constitute clear and unmistakable evidence of intent to have arbitrator decide arbitrability).

*NASDAQ OMX*, 770 F.3d at 1032 (emphasis added).

DDK Hospitality acknowledges that incorporation of AAA Rules *may* be enough under certain circumstances, such as where the agreement expressly delegates arbitrability, or where the agreement to arbitrate is broad and contains no exclusionary language. *See, e.g., Rent-a-Center, West, Inc. v. Jackson*, 561 U.S. 63, 66, 130 S. Ct. 2772, 2775 (2010) (arbitration clause read "[t]he Arbitrator . . . shall have exclusive authority to resolve any dispute relating to the interpretation, applicability, enforceability or formation of this [Arbitration] Agreement is void); *Contec Corp.,* 398 F.3d at 208 (incorporating AAA rules to arbitration provision that sent "any controversy arising with respect to this Agreement . . . ." sufficient); *Worthington v. JetSmarter, Inc.*, 2019 WL 4933635, at *2 (S.D.N.Y. Oct. 7, 2019) (clause read "[a]ny claim or dispute between the parties . .including the validity of this clause . . . shall be resolved exclusively by binding arbitration by the American Arbitration Association, under the Commercial Arbitration rules . . . which are deemed incorporated by reference."). None of those cases, however, support the

18

argument that simply citing the AAA Rules is enough to delegate every single dispute, including the arbitrability of each dispute.

*Contec Corp.* provides a useful example. The arbitration agreement in that case was structured in such a manner as to send "any controversy arising with respect to this Agreement" to arbitration, and each "such controversy" was subject to the AAA Rules. *Contec Corp.*, 398 F.3d at 208. Applying the analysis required by *Bucsek*, a district court would analyze this agreement and surely conclude that the parties clearly and unmistakably intended to delegate the question of arbitrability. The agreement contained no exceptions, exclusions, or carve-out language; the AAA Rules in their entirety applied to every dispute pertaining to the agreement. *Id.* This does not mean, however, that where arbitration agreements are worded differently, such as in *NASDAQ OMX*, a court cannot correctly reach a different conclusion. Accordingly, the Court distinguished *Contec Corp.* in its analysis. *NASDAQ OMX*, 770 F.3d at 1032.

### B. West Elm advocates for an automatic implied delegation theory that is contrary to applicable law.

Section 16(b) of the Deadlock Section says nothing about who decides arbitrability. It does not state that the arbitrators will have authority to resolve arbitrability disputes much less that they will have exclusive authority to do so. Nevertheless, West Elm argues that the limited incorporation of the AAA Rules

19

impliedly delegates the arbitrability decision for all disputes arising under the JV Agreement. *See App. Br.*, pp. 22-23. Its argument is based on AAA Commercial Rule 7(a), which states "[t]he arbitrator shall have the power to rule on his or her own jurisdiction, including . . . the existence, scope, or validity of the arbitration agreement . . . ." AAA Commercial R. 7(a). While courts have found that incorporation of the AAA Rules in certain agreements constitutes clear and unmistakable evidence, there is no support for West Elm's broad automatic implied delegation theory.

Parties may limit the disputes they shall arbitrate and which disputes will be covered by AAA rules. *Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 683, 130 S. Ct. 1758, 1774 (2010). It follows, *a fortiori*, that parties may also limit which disputes will be submitted to the arbitrator for an arbitrability decision. *See Mastrobuono v. Shearson Lehman Hutton*, 514 U.S. 52, 57, 115 S. Ct. 1212, 1216 (1995) (internal citations omitted) ("Just as [parties] may limit by contract the issues which they will arbitrate, . . . so too may they specify by contract the rules under which that arbitration will be conducted."). Where the plain language of an arbitration agreement excepts or excludes particular disputes from the arbitrator, it is nonsensical to think the parties nonetheless intended for the arbitrator to decide the arbitrability of those disputes. The only thing that is clear and unmistakable from

20

this sort of provision is that the parties did not want the arbitrator to touch those disputes in any fashion.

The Supreme Court has provided no support for West Elm's automatic implied delegation theory. *See First Options*, 514 U.S. at 945, 115 S. Ct. at 1925 ("one can understand why courts might hesitate to interpret silence or ambiguity on the 'who should decide arbitrability' point as giving the arbitrators that power . . . ."). Rather, it has held that disputes are not arbitrable if "it is clear that the arbitration clause has not included them." *Id.* (internal citations and quotations omitted). To be sure, the *Schein I* Court recognized that the AAA Rules "provide that arbitrators have the power to resolve arbitrability questions." *Schein I*, 139 S. Ct. at 528. That statement must be put in context. The purpose of the statement was to correct the Fifth Circuit's use of a "wholly groundless" exception in the case below. *Id.* at 529. In recognizing that AAA Commercial Rule 7(a) reads "[t]he arbitrator shall have the power to rule on his or her own jurisdiction . . .," the Supreme Court held that where an agreement incorporates AAA Rules, the court cannot displace the arbitrator's power to rule on its jurisdiction over disputes *within the scope* of the arbitration agreement. *Id.* In other words, the Fifth Circuit was incorrect in holding that the parties could keep the arbitrability question in the courts merely by ruling that the argument for arbitration is "wholly groundless." That is altogether different from the notion that arbitrators are the only ones that can decide their jurisdiction, or that

21

in all instances where a reference to the AAA Rules "is present" in an agreement the courts have no ability to analyze the agreement to ascertain the parties' intent. In arguing for this automatic implied delegation theory, West Elm stretches *Schein I* well beyond its limits.[3]

It makes far more sense to view the incorporation of AAA Rules as providing the ground rules for those disputes that, pursuant to the arbitration agreement, are actually arbitrable. The AAA Rules play a role in arbitrations generally and parties may therefore incorporate them, even if they gave no thought to delegating the arbitrability question. This is particularly so where the parties presumed, as most do, that the court would retain its long-established gatekeeping role on this issue. *See First Options*, 514 U.S. at 945, 115 S. Ct. at 1925. Such an approach is consonant with this Court's reasoning in *NASDAQ OMX . Id.*, 770 F.3d at 1032 (arbitration agreement "provides for AAA rules to apply to such arbitrations as may arise under the Agreement.").[4]

---

[3] West Elm also cites to *C & L Enters., Inc. v. Citizen Band Patawatomi Indian Tribe of Okla.*, 532 U.S. 411, 121 S. Ct. 1589 (2001) on page 21 of its brief in further support of this point. That case did not address questions of delegation, arbitrability or scope. The question in that case was whether tribal immunity could be used to avoid suit in federal district court, thereby avoiding enforcement of an arbitration award. *Id.*, at 414, 121 S. Ct. at 1592.

[4] West Elm cannot avoid this reality. It cites to *Oracle America, Inc. v. Myriad Group, A.G.*, 724 F.3d 1069 (9th Cir. 2013) in support of the dubious notion that

22

This theory of automatic implied delegation for arbitrability has no applicable support from any controlling case. This Court has expressly objected to automatically sending arbitrability to the arbitrator, absent analysis of the parties' intent. *See Shaw Group, Inc. v. Triplefine Int'l Corp.*, 322 F.3d 115 (2d Cir. 2003); *Painewebber, Inc. v. Bybyk*, 81 F.3d 1193 (2d Cir. 1996). In *Shaw Group*, the parties agreed to arbitrate "all disputes . . . concerning or arising out of this Agreement" according to the rules and procedures for arbitration in the International Chamber of Commerce ("ICC"), incorporated by reference. *Id.* at 120. Though the ICC rules featured a jurisdictional provision very similar to AAA Commercial Rule 7(a), the Court noted its task was to interpret the agreement to determine whether the arbitration provision clearly and unmistakably demonstrated arbitrators were to resolve the arbitrability question. *Id.* In doing so, the Court turned to principles of contract law, including that "the words and phrases in a contract should be given their plain meaning." *Id.*

In *Painewebber*, the Court also analyzed the arbitration provision, which covered "any and all controversies . . . concerning any account, transaction, dispute

---

where the parties delegate issues of arbitrability to the arbitrator in any fashion, there is no role for the court to play on arbitrability, no matter what the agreement says. That proposition clashes directly with this Court's precedent, including *Bucsek* and *NASDAQ OMX*.

or the construction, performance, or breach of this or any other agreement" and subjected all such controversies to FAA arbitration rules. *Painewebber*, 81 F.3d at 1199. The court reasoned the words "any and all" were "elastic enough to encompass disputes over whether a claim is . . . within the scope of arbitration." *Id*. Importantly, the *Painewebber* Court conditioned its holding on the fact that "[t]he Parties' broad grant of power to the arbitrators is unqualified by any language carving out substantive eligibility issues . . . for resolution by the courts." *Id.* at 1200.

DDK Hospitality asks this Court to apply basic principles of contract interpretation to conclude the parties intended to apply the AAA Rules to certain disputes, but not to others. West Elm, on the other hand, asks this Court to jump through hoops and accept a theory that breaks ranks with the consistent message of federal arbitration jurisprudence that the "usual presumption" for arbitrability is that the courts decide. *First Options*, 541 U.S. at 944, 115 S. Ct. at 1924; *AT&T Techs., Inc. v. Comms. Workers of America*, 475 U.S. 643, 649, 106 S. Ct. 1415, 1418 (1986); *Howsam*, 537 U.S. at 83, 86, 123 S. Ct. at 591, 593.

**3.     The district court did not err in its analysis of the Deadlock Section of the JV Agreement.**

DDK Hospitality and West Elm agree the district court was required to enforce the JV Agreement as it is written. *Schein I*, 139 S. Ct. at 530. To do so, however, required careful analysis of what the arbitration provision in Section 16(b)

says and what the parties intended when they drafted it. Both District Judge Glasser and Magistrate Judge Pollak performed that analysis and concluded, based upon a plain language reading of Section 16, the parties intended only to send "Disputed Matters" to the arbitrators. SPA 23, JA 199-200. The parties did not intend for disputes falling outside of that defined term, or the arbitrability of such disputes, to go to the arbitrator. West Elm seeks to ignore the parties' obvious intent and enforce terms that are not in the JV Agreement. Its argument defies settled principles of contract law, this Court's precedent, and long-standing tenets of federal arbitration jurisprudence.

## A. The district court properly analyzed Section 16(b) of the Deadlock Section under *Bucsek*.

Gateway questions of arbitrability are presumed to reside with the courts absent clear and unmistakable evidence to the contrary. *Howsam*, 537 U.S. at 83, 123 S. Ct. at 591; *First Options*, 514 U.S. at 944, 115 S. Ct. at 1924; *NASDAQ OMX*, 770 F.3d at 1031; *Bucsek* 919 F.3d at 190. The clearer it is that the parties intended to arbitrate a particular dispute, "the more logical and likely the inference that they intended to arbitrate the arbitrability of the dispute." *Bucsek*, 919 F.3d at 191, *citing Wells Fargo Advisors, LLC v. Sappington*, 884 F.3d 392, 394, 396 (2d Cir. 2018). Alternatively, the clearer it is that the terms do *not* mandate arbitration of a particular dispute, "the less likely it is that the parties intended to be bound to arbitrate the

question of arbitrability . . . and vague provisions as to whether the dispute is arbitrable are unlikely to provide the needed clear and unmistakable inference of intent to arbitrate its arbitrability." *Bucsek*, 919 F.3d at 191.

Section 16(b) of the JV Agreement reads in relevant part:

> [t]he parties unconditionally and irrevocably agree that, with the exception of injunctive relief as provided herein, and except as provided in <u>Section 16(c)</u> all Disputed Matters that are not resolved pursuant to the mediation process provided in <u>Section 16(a)</u> may be submitted by either Member to binding arbitration administered by the American Arbitration Association ("AAA") for resolution in accordance with the Commercial Arbitration Rules . . . then in effect . . . .

SA 16. The term "Disputed Matter" is defined as "a matter requiring Board or Member approval . . ." on which the Members cannot agree. SA 15. Whether the AAA Rules, including Rule 7(a), apply is governed by the conditional premise that the dispute falls within the definition of "Disputed Matter." If it does not, then the AAA Rules do not apply. *See NASDAQ OMX*, 770 F.3d at 1032.

The long-established doctrine of *expressio unius est exclusio alterius* provides support for the district court's interpretation of Deadlock Section 16. Under principles of Delaware contract law,[5] where parties to an agreement expressly

---

[5] The JV Agreement is governed by Delaware law. SA 21.

26

identify specific items from a broader list, courts will presume the parties intended to exclude those items not enumerated. *iBio, Inc. v. Fraunhofer USA, Inc.*, 2016 WL 4059257, at *6 n. 59 (Del. Ch. July 29, 2016) ("[i]f one subject is specifically named, or if several subjects of a larger class are specifically enumerated, and there are no general words to show that other subjects of that class are included, it may reasonably be inferred that the subjects not specifically named were intended to be excluded."), *quoting* ARTHUR L. CORBIN, 3 CORBIN ON CONTRACTS § 552 at 206 (1906); *see also Seidensticker v. Gasparilla Inn, Inc.*, 2007 WL 4054473, at *3 (Del. Ch. Nov. 8, 2007) (by naming only one individual in section of contract, drafters excluded those other individuals that may have been contemplated, due to *expressio unius est exclusio alterius*); *Active Asset Recovery, Inc. v. Real Estate Asset Recovery Servs., Inc.*, 1999 WL 743479, at *11 (Del. Ch. Sept. 10, 1999) (applying *expressio unius est exclusio alterius* in contract interpretation). In fact, this Court has applied the maxim to determine which matters are excluded from the scope of an arbitration agreement. *Cornell Univ. v. UAW Local 2300*, 942 F.2d 138, 139 (2d Cir. 1991) (applying New York law); s*ee also National Credit Union Admin. Bd. v. U.S. Bank National Ass'n*, 898 F.3d 243, 254-55 (2d Cir. 2018) (applying New York law, expressly granting a right to some under a contract entailed the denial of such a right to others, otherwise the court would contravene the parties' intent); *see also VKK Corp. v. National Football League*, 244 F.3d 114, 122, 130 (2d Cir. 2001)

27

(under principles of New York contract law, release that included specific enumerated releasors but not specific releasees impliedly excluded certain releasees).

Much as in *NASDAQ OMX*, the AAA Rules do not come into play unless the dispute is contractually mandated to be arbitrated, pursuant to the JV Agreement. *NASDAQ OMX*, 770 F.3d at 1032. There is no credible argument that the parties intended for the AAA Rules to apply to all disputes arising under the JV Agreement. This Court's precedent, most recently set forth in *Bucsek*, required the district court to analyze the Deadlock Section 16 in the context of the entire JV Agreement to determine the parties' intent on this issue. The court did so correctly.[6]

---

[6] West Elm disparages the district court's analysis as being too succinct and not sufficiently "nuanced." *App. Br.,* p. 35, n.15. These criticisms are unjustified. The district judge had the benefit of the magistrate judge's 15-page decision, (JA 193-207), which he refenced, and her analysis with which he concurred. SPA 23-24. Moreover, he cited and correctly applied *Bucsek*, and acknowledged both *Schein I* and its rejection of the "wholly groundless" exception. SPA 22-24. West Elm's claim that the district court "improperly … made the 'wholly groundless' determination expressly prohibited by the Supreme Court," *App. Br.,* p. 26, is among the most puzzling and baseless contentions in its brief, *see* SPA 23-24, n.17.

**B.    The district court did not err in ruling that a dispute under Section 21(h) did not fall within Section 16(b) of the Deadlock Section.**

The district court determined that claims between DDK Hospitality and West Elm arising under Section 21(h) of the JV Agreement do not fall within the realm of "Disputed Matters" covered by Deadlock Section 16. SPA 23-24. Any rational, plain text interpretation of the JV Agreement leads to the inexorable conclusion that DDK Hospitality had no obligations to arbitrate that claim or to follow the Deadlock procedure in Section 16. To be sure, it is entitled "Deadlock" for a reason. It is a mechanism of limited application that is to be resorted to if the Company's Board deadlocks on a matter requiring the Board's approval. By its express terms, it is limited to Members "acting through the Board." It applies to all matters requiring approval of the Board, on which the Board is unable to agree, except a limited list of matters designated as "Fundamental Decisions." *See* SA 15-16.

Unlike the parties in *Contec Corp.*, West Elm and DDK Hospitality had no "agreed-to obligation to arbitrate *all* disputes, including the question of arbitrability." *Contec Corp.*, 398 F.3d at 211. They understood that not all disputes arising under the JV Agreement would go to arbitration. Despite the incorporation of the AAA Rules, the plain language of Section 16(b) demonstrates explicit intent to subject only certain matters to arbitration and thus to application of the AAA Rules. Exhibit C to the JV Agreement contains a nonexclusive list of matters and

29

decisions requiring Board approval. Prevailing party fees following a court adjudication is not on that list. Thus, disputes under Section 21(h) are not pulled into the scope of Section 16.

Section 21(h) provides, in relevant part:

> [t]he non-prevailing Member shall pay upon demand all of the reasonable costs, charges and expenses including the court costs and fees and out-of-pocket expenses of counsel, agents and others retained by the prevailing Member incurred by the prevailing Member in enforcing the terms of the Agreement. A Member shall be deemed a "prevailing party" only after all rights of appeal from a favorable adjudication shall have expired or been waived.

SA 21. The matter of prevailing party fees following litigation between the Members of the Company is quite removed from the Company and its Board. DDK Hospitality sought prevailing party fees under Section 21(h) following its success in the Delaware Dissolution Action. The Company did not initiate the Delaware Dissolution Action, did not cause DDK Hospitality to incur litigation costs, took no position in that action, is not obligated to pay either Member's legal fees, and has no say in deciding whether such payment should be made. The Company has no role in any of that, and its Board has no decision to make on behalf of the Company. That took the present dispute out of the ambit of Deadlock Section 16. Accordingly, both Judges Pollak and Glasser recognized the fatal flaw in West Elm's argument. SPA 23-24; JA 8-9. This Court should recognize it too.

30

Importantly, this outcome is not the result of a "wholly groundless" analysis, but rather what comes from a plain reading of the arbitration provision and the parties' manifest intent. *Bucsek*, 919 F.3d at 195-96. Much like the arbitration provision in *Bucsek*, Deadlock Section 16 could not "be reasonably interpreted to provide for arbitration of the dispute . . . [which] is a substantial makeweight against such a conclusion [that the agreement provides for arbitration of arbitrability] unless counterbalanced by clear language contradicting the logical inference that parties who clearly agree not to arbitrate a particular type of dispute are unlikely to intend to arbitrate the arbitrability of such a dispute." *Bucsek*, 919 F.3d at 195. Acknowledging that arbitration provisions and delegations of authority do not exist in a vacuum, the district court applied *Bucsek* and came to the correct conclusion. SPA 23. West Elm may be disappointed by this outcome, but that does not mean the district court erred. Misinterpreting Deadlock Section 16 as expressing the necessary "clear and unmistakable intent" would have forced DDK Hospitality to endure what federal law insists must be avoided: being compelled to surrender its right to court adjudication without its consent. *Bucsek*, 919 F.3d at 190.

### C. Incorporation of the AAA Rules into Section 16(b) of the JV Agreement did not strip the district court of its authority to rule on arbitrability.

*NASDAQ OMX* makes clear that where the arbitration provision contains either qualifying provisions that determine which controversies are arbitrable or

31

exclusions that except certain controversies from arbitrability, incorporating the AAA Rules alone is not enough. *Id.*, 770 F.3d at 1031. The wording of such arbitration provisions "delays application of the AAA rules until a decision is made as to whether a question does or does not fall within the intended scope of arbitration, in short, until arbitration is decided." *Id.* at 1032. Cases involving arbitration provisions with qualifying provisions are "not akin to those in which [the Second Circuit has] construed the incorporation of AAA rules into an agreement . . . to signal the parties' clear and unmistakable intent . . . ." *Id.,* at 1032. Where the dispute is arguably covered by the qualifying provision, the arbitration agreement does not demonstrate clear and unmistakable evidence of an intent to delegate. *Id.,* at 1031; *citing Katz v. Feinberg*, 290 F.3d 95, 97 (2d Cir. 2002).

Section 16(b) of the Deadlock Section incorporates the AAA Rules but applies them only for arbitrations of "Disputed Matters." Section 16(b) specifically exempts from arbitration all claims and controversies that do not qualify as "Disputed Matters." Thus, Section 16(b) contains no language directly addressing who decides arbitrability for disputes that are not "Disputed Matters." This type of arbitration clause is distinct from those broad clauses where this Court has construed the incorporation of AAA Rules signals "clear and unmistakable intent to submit arbitrability disputes to arbitration." *NASDAQ OMX*, 770 F.3d at 1032, *citing Contec Corp.*, 398 F.3d at 208. The parties' dispute over prevailing party fees and DDK

32

Hospitality's breach of contract claim falls well outside the narrow class of Board deadlocks that are "Disputed Matters."

**4.    West Elm's semantic game about "carve-outs" does not alter the persuasive authority of S*chein II* and the controlling precedent of *NASDAQ OMX.***

West Elm spends much time focusing on the express carve-outs for injunctive relief and "Fundamental Decisions." *See App. Br.*, pp. 27-37. DDK Hospitality has never argued these carve-outs apply, nor has it argued the existence of those carve-outs demonstrate there is not clear and unmistakable evidence of intent. Rather, Deadlock Section 16 itself operates as a carve-in, or qualifying provision, which creates a limited subset of controversies that are arbitrable. Federal arbitration jurisprudence is explicit that where such a qualifying provision is present, there can be no clear and unmistakable evidence of a delegation of arbitrability. *See Schein II*, 935 F.3d at 281, 283; *NASDAQ OMX*, 770 F3d at 1031-32.[7]

**A.    *Schein II* supports affirmance of the district court's Order.**

The *Schein II* Court's rationale and holding are far broader than West Elm concedes. On remand from the Supreme Court's decision in *Schein I*, the Fifth

---

[7] It is worth noting that on page 31, fn. 12 of its brief, West Elm acknowledges that the *NASDAQ OMX* and *Schein II* cases create an exception "for express and exclusionary carve-outs where there is an allegation that the claim in question falls within the carve-out." *Id.* This is exactly what Section 16(b) presents.

Circuit noted arbitration is a matter of contract formation and interpretation. *Schein II*, 935 F.3d 274. It reviewed the specific language of the arbitration clause at issue, concluding "the placement of the carve-out . . . is dispositive . . . [and] . . . [t]he most natural reading of the arbitration clause at issue here states that any dispute, except actions seeking injunctive relief, shall be resolved in arbitration with the AAA rules . . . ." *Id.* at 281. The Fifth Circuit could not "re-write the words of the contract." *Id.* Though the "[t]he plain language incorporates the AAA rules – and therefore delegates arbitrability" it did so only for those disputes not carved out from arbitration altogether. *Id.* "Given that carve-out," the Fifth Circuit concluded, "we cannot say that the Dealer Agreement evinces a clear and unmistakable intent to delegate arbitrability." *Id.* at 281-82. Notably, the Fifth Circuit relied on this Court's decision and reasoning in *NASDAQ OMX* to reach that conclusion. *Id.*

In reaching its holding, the Fifth Circuit noted that it was "mindful of the [Supreme] Court's reminder that [w]hen the parties' contract delegates the arbitrability question to an arbitrator, the courts must respect the parties' decision as embodied in the contract." *Id.* at 282, citing *Schein* I, 139 S. Ct. at 531. But it also needed to "heed [the Supreme Court's] warning that courts should not assume that the parties agreed to arbitrate arbitrability unless there is clear and unmistakable evidence that they did so." *Schein II*, 935 F.3d at 282 (internal quotations omitted).

"The parties could have unambiguously delegated this question, but they did not, and [the courts] are not empowered to re-write their agreement." *Id.*

Here, West Elm looks to the wrong "carve-out" language. That the present dispute over prevailing party fees concerns neither injunctive relief nor a "Fundamental Decision" is irrelevant. *See App. Br.*, pp. 28-29, 31. What is dispositive is the qualifier "*all Disputed Matters that are not resolved pursuant to the mediation process* provided in Section 16(a) may be submitted to . . . binding arbitration administered by the American Arbitration Association . . . ." SA 16 (emphasis added). As in *Schein II*, an arbitration agreement fashioned in this manner lacks clear and unmistakable intent to delegate the arbitrability question for all disputes. *Schein II*, 935 F.3d at 282. Try though it might, West Elm cannot rewrite the words of the contract; neither can this Court. *Id.* at 283.

West Elm apparently believed the Supreme Court was primed to overrule *NASDAQ OMX*, following acceptance of a petition for certiorari from the Fifth Circuit's decision in *Schein II. See App. Br.*, pp. 32-33. As West Elm explains, the *Schein II* petitioners sought certiorari from the Supreme Court on the question of "whether a provision in an arbitration agreement that exempts certain claims from arbitration negates an otherwise clear and unmistakable delegation of questions of arbitrability to an arbitrator." *Id.* at 32. Inherent to the petition was an assumption that an incorporation of the AAA Rules provided clear and unmistakable evidence

35

of an intent to delegate, thereby allowing the Supreme Court to focus solely on the effect of carve-out language under such circumstances. *See* Petition for Writ of Certiorari, *Henry Schein, Inc. v. Archer & White Sales, Inc.,* No. 19-963, 114 S. Ct. 107, 2020 WL 529125, at *9, 11-12 (U.S. Jan. 31, 2020). The ultimate goal, according to West Elm, was for the Supreme Court to overrule *NASDAQ OMX* and *Schein II* in favor of *Oracle America*. *App. Br*., pp. 32-33.

On January 25, 2021, however, the Supreme Court issued a *per curiam* opinion stating simply "[t]he writ of certiorari is dismissed as improvidently granted." *Henry Schein, Inc. v. Archer and White Sales, Inc.*, No. 19-963, 141 S. Ct. 656, 2021 WL 231537 (U.S. Jan. 25, 2021). Not only does that resolution confirm, yet again, that mere incorporation of AAA Rules alone does provide the necessary clear and unmistakable evidence, it also demonstrates that *NASDAQ OMX* has not been overruled and continues to guide this Court as binding precedent.

### B. *NASDAQ OMX* is controlling and mandates affirmance because it instructs that the AAA Rules "apply [only] to such arbitrations as may arise under the Agreement."

In *NASDAQ OMX*, this Court explained that "where a broad arbitration clause is subject to a *qualifying provision* that at least *arguably covers* the present dispute we have identified ambiguity as to the parties' intent to have questions of arbitrability – which would include whether a dispute falls within or outside the scope of the qualifier – decided by an arbitrator." *NASDAQ OMX*, 770 F.3d at 1031

36

(emphasis added). *Id.* As discussed throughout this brief, the plain language of the Deadlock Section 16 provides for AAA Rules to apply to arbitrations but only those that may arise under that section. Once a court determines that the dispute falls under the umbrella of "Disputed Matters" then, and only then, do the AAA Rules, including Commercial Rule 7(a), apply. It makes no difference under *NASDAQ OMX* whether a clause of the arbitration provision constitutes a carve-out, an exception, an exclusion, or a carve-in. Section 16 contains a qualifying provision, and a dispute over prevailing party fees under Section 21(h) plainly does not meet the definition of a Disputed Matter.

West Elm attempts incorrectly to limit *NASDAQ OMX's* reach by citing to a 2017 case from the Eastern District of New York, *Saizhang Guan v. Uber Tech., Inc.,* 236 F. Supp.3d 711 (E.D.N.Y. 2017). *Guan* is inapplicable. In that case, the district court was faced with an agreement that contained an explicit delegation clause, which read

> such disputes [that will be decided by arbitration] include without limitation disputes arising out of or in relation to interpretation or application of this Arbitration provision, including the enforceability, revocability or validity of the Arbitration provision or any portion of the Arbitration Provision. *All such matters shall be decided by an Arbitrator and not by a court or a judge.*

37

*Id.* at 718 (emphasis added). The arbitration provision in *Guan* further stated "[e]xcept as it otherwise provides, this Arbitration Provision is intended to apply to the resolution of disputes that otherwise would be resolved in a court of law or before any forum other than arbitration . . . ." *Id.* There was no ambiguity that the parties intended to delegate arbitrability; they delegated everything to the arbitrator related to the agreement. Deadlock Section 16 contains no such language, nor does it contain an explicit delegation clause.

In discussing the *Guan* case, however, West Elm unwittingly admits that applying *NASDAQ OMX* requires a "nuanced analysis based on the specific claim and arbitration language at issue." *App. Br.*, p. 36. It therefore agrees with DDK Hospitality that the principles set forth in that case are controlling and the district court had to engage in that nuanced analysis of the specific claim and arbitration language.[8] As explained in Sections 3A and 3B *supra*, that is precisely what the district court did.

Because a dispute over prevailing party fees is excluded by the qualifying language in Deadlock Section 16, *NASDAQ OMX* controls the outcome of this case. This Court should similarly find that the JV Agreement does not present clear and

---

[8] West Elm mischaracterizes DDK Hospitality's argument below. It has never argued that the "wholly groundless" exception should apply to the JV Agreement or the District Court's analysis thereof.

unmistakable evidence of intent to delegate the arbitrability of DDK Hospitality's claim for breach of Section 21(h) and affirm the district court's Order.

**5.      DDK Hospitality's request for "prevailing party" fees under Section 21(h) of the JV Agreement.**

Since prevailing in the Delaware Dissolution Action, and incurring $67,594.31 in fees, DDK Hospitality has been forced to bring a contested motion to file a supplemental complaint to assert its claim for West Elm's breach of Section 21(h) of the JV Agreement, oppose west Elm's motion to dismiss or compel arbitration and now respond to this appeal.

If the Court should affirm the district court's Order, DDK Hospitality respectfully requests that the Court direct DDK Hospitality to submit an application, either to this Court or to district court, for prevailing party fees incurred in this appeal, pursuant to Section 21(h) of the JV Agreement.

**CONCLUSION**

This Court has clearly articulated the process for, and underlying principles applicable to, the analysis of West Elm's contention that DDK Hotel's breach of contract claim is arbitrable and that arbitrability must be determined by an arbitrator. Despite that clear precedent, West Elm asks that it be ignored and that the Court hold that the district court erred because it did not follow the Ninth Circuit's decision in *Oracle America*.

39

The Court should reject that request and affirm the district court's Order.

Respectfully submitted,
DAVIS, MALM & D'AGOSTINE, P.C.


By: /s/ Thomas S. Fitzpatrick

Thomas S. Fitzpatrick, Esq.
One Boston Place
Boston, Massachusetts 02108
(617) 367-2500
E-mail: tfitzpatrick@davismalm.com

Attorneys for Plaintiffs/Appellees, DDK Hotels, LLC,
DDK/WE Hospitality Partners, LLC,
and DDK/WE Hotels Management, LLC

Dated: February 18, 2021

## **<u>CERTIFICATE OF COMPLIANCE</u>**

The undersigned counsel certifies that, compliant with Federal Rule of Appellate Procedure 32(a)(5)-(6) and Local Rule 32.1, Plaintiffs-Appellees' Principal Brief uses a proportionally-spaced Times New Roman typeface, 14-point, and that the text of the brief contains 9,516 words according to the word count provided by Microsoft Word, not accounting for the items excluded by FRAP 32(f).

/s/ Thomas S. Fitzpatrick
Thomas S. Fitzpatrick